**In re SHOREHAM PAPER COMPANY (f/k/a Watervliet Paper Company, Inc.), Debtor.**

**WATERVLIET PAPER COMPANY, INC., Plaintiff,**

v.

**CITY OF WATERVLIET and Berrien County, Defendants.**

**Bankruptcy No. SK 88–03257. Adv. No. 89–0237.**

United States Bankruptcy Court, W.D. Michigan.

July 27, 1990.

Harold Nelson, for debtor.

F.A. Jones, for City.

Thomas K. Byerley, for County.

OPINION

JO ANN C. STEVENSON, Bankruptcy Judge.

This matter comes to the court on motion for partial summary judgment filed by the Debtor Shoreham Paper Company, f/k/a

Watervliet Paper Company, Inc. ("Watervliet" or "Debtor").[1] Defendant Berrien County ("County") and the City of Watervliet ("City") have filed answers and briefs in support.[2] Watervliet, the County and the City all agree that there is no genuine issue as to any material fact and that the question presented is one of law.

This proceeding arises in a case referred to this court by the standing order of reference entered in this district on July 23, 1984 and is determined to be a core proceeding pursuant to 28 U.S.C. Section 157(b)(2)(A) and (G).

Prior to bankruptcy, Watervliet Paper Company owned and operated a paper mill consisting of significant quantities of real and personal property located in the City and Township of Watervliet, Berrien County, Michigan. On October 3, 1988, three creditors filed an involuntary petition against Watervliet, and on December 23, 1988, Watervliet converted to Chapter 11.

Initially it appeared that there were a number of questions as to the status and priority of several years of real, personal, and industrial facilities taxes (IFT). On November 27, 1989, however, the parties advised the court that the only issue still in contention was the status of the 1988 winter real property taxes totaling $33,995.33.

Pursuant to Michigan law, 1988 taxes were assessed on December 31, 1987 (tax day). And in 1988, real property taxes became due and payable and a lien arose to secure their collection on December 1, 1988 (lien day). Because the involuntary petition was filed pursuant to 11 U.S.C. § 303 on October 13, 1988,[3] between tax day and lien day, the issue becomes whether the Bankruptcy Code's automatic stay prohibits the creation and perfection of a post-petition lien for unpaid real property taxes assessed prepetition.

11 U.S.C. section 362(a)(4) provides as follows:

**§ 362. Automatic stay.**

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302 or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 USC 78eee(a)(3)), operates as a stay, applicable to all entities, of—

.     .     .     .     .

(4) any act to create, perfect, or enforce any lien against property of the estate;

Traditionally, real estate taxes and the incidents relating to the collection of such taxes are matters left to local statute. Thus, state law governs as to when tax liens are created and perfected. In *City of Gaylord v. Beckett*, 378 Mich. 273 (1966), the Michigan Supreme Court instructed that unless a taxing statute expressly provides, taxes are not a lien on property. With respect to Michigan general property law, there can be no lien that is not consistent with express statutory language.

The Michigan statute which governs here is M.C.L.A. 211.2 Real Property, which states in relevant part:

**Tax Day, preparation of assessment role, examination of properties by assessors.**

The taxable status of persons and real and personal property shall be determined by each December 31, which shall be deemed the tax day, any provisions in

---

**1.** On March 7, 1989 the Watervliet Paper Co., Inc., sold substantially all of its operating assets including its name to a subsidiary corporation of the Kopaco Group. The name was then changed with respect to the corporate records of the States of Michigan and Delaware from Watervliet Paper Co., Inc., to Shoreham Paper Co. Because of the court's familiarity with this case under its filed name, the Debtor will continue to be referred to as Watervliet.

**2.** Although Watervliet's Motion also named the City of Watervliet as a Defendant, the court understands that Watervliet Township not the City should have been named as a Defendant. However, all taxes billed by Watervliet Township were turned over to the Berrien County Treasurer on March 1, 1989 as delinquent, and as the County is now responsible for their collection, the failure to name Watervliet Township is of no consequence.

**3.** The automatic stay provision of 11 U.S.C. Section 362(a) is applicable to an involuntary petition filed under Section 303 unless an exception to the stay is applicable pursuant to Section 362(b).

the charter of any city or village to the contrary notwithstanding. No assessing officer shall be restricted to any particular period in the preparation of the assessment role but may survey, examine or review properties at any time prior to or after the tax day.

And, M.C.L.A. 211.40 in pertinent part provides:

Notwithstanding any provisions in the charter of any city or village to the contrary, all taxes shall become a debt due to the township, city, village and county from the owner or person otherwise to be assessed on the tax day provided for in Sections 2 and 13 of this act, and the amounts assessed on any interest in real property shall, on the 1st day of December, for state, county, village or township taxes or upon such day as may be heretofore or hereafter provided by charter of the city or village, become a lien upon such real property, and the lien for such amounts, and for all interest and charges thereon, shall continue until payment thereof.

Thus, in Michigan the lien on real property that is consistent with express statutory language arises on December 1st of any given year in relation to the taxes assessed on December 31st of the preceding year. As cogently explained in *Boekeloo v. Hodel*, 828 F.2d 727, 729 (Fed.Cir.1987)

Michigan real property taxes are assessed and levied on a calendar year basis with the tax "debt" arising as of December 31 of the preceding year, i.e., the "tax day"; the amount is determined during the ensuing months; and a bill is issued on December 1 of that year, i.e., the "levy date." Thus, a bill issued December 1, 1978, for example, covers the period January 1, 1978, to December 31, 1978. A lien attaches to the property as of December 1, 1978, which continues until payment of the taxes. Mich.Comp. Laws § 211.40 (1979) (Mich.Stat.Ann. § 7.81 (Callaghan 1984)). The United States takes title to property subject to any liens on the property which exist on the date of transfer. *United States v. Michigan*, 346 F.Supp. 1277 (1972) (*Mi-*

*chigan I*), rev'd on reconsideration, 429 F.Supp. 8, 10–11 (E.D.Mich.1977) (*Michigan II*).

In *United States v. Michigan*, 429 F.Supp. 8 (E.D.Mich.1977), the district court examined an issue similar to the one at hand. The United States had purchased four pieces of real property subsequent to "tax day" but prior to the "lien day" of December 1st. At the time of the purchase, the property was subject to unpaid city and county taxes which had not yet become a lien. The taxing authorities argued that although the statute specifies December 1 as the day the tax lien attaches, there was an "inchoate" lien which attached on the previous "tax day" of December 31. Thus on the pre December 1 purchase date, the properties were burdened with "liens" for county and city taxes which were only dischargeable upon payment of the taxes owing. The court soundly rejected that argument.

We can find no justification, legally or logically, to assume that the legislature meant "inchoate lien" by use of the words "debt due", particularly when the word "lien" appears in the same sentence. Had the phrase "debt due" been intended as a lien of any kind the legislature could have easily so indicated.... Unless a taxing statute expressly so provides, taxes do not constitute a lien on property. *Tousey v. Post*, 91 Mich. 631, 634, 52 N.W. 57; 84 C.J.S. Taxation § 585, p. 1180. 429 F.Supp. at 10.

Both the Michigan statute and the interpretive case law recognize that real property tax liens both arise and are perfected on the same day, which here was after the filing of the involuntary petition. Giving due regard to the plain meaning of the statute as the United States Supreme Court instructs we must, *United States v. Ron Pair Enterprises, Inc.*, 109 S.Ct. 1026, 1031 (1989), it is readily apparent that Section 362(a)(4) prevented the creation of the taxing authority's lien. This concept was succinctly explained in *In re Carlisle Court*, 36 B.R. 209 (Bkrtcy.D.D.C.1983):

Because the subject property, as property of the estate pursuant to 11 USC 541

of the Code, is in *"custodia legis"*, the right to even "create" as well as "enforce" any such lien is clearly interdicted by the filing of a petition. The express language of the automatic stay prevents this and such prohibition remains as long as the stay is in effect.

36 B.R. 214

This result finds further support in *Equibank, N.A. and the Farmers' Home Administration v. Wheeling Pittsburgh Steel Corporation,* 884 F.2d 80 (3rd Cir.1989). There the Third Circuit was dealing with both pre- and post-petition personal and real property taxes. Debtor Wheeling–Pittsburgh Steel Corporation closed its doors in 1984 and tried to find a buyer. Failing to do so, it eventually filed Chapter 11 on April 16, 1985 with the Debtor finally selling its plant on September 14, 1987. At the closing, the question arose as to whether the 1985 and 1987 real and personal property taxes were to be paid out of the escrowed sale proceeds, thereby reducing the funds available to the mortgage holders, or by the estate as an administrative expense. The district court affirmed the bankruptcy court's order that the taxes be paid out of the escrowed sale proceeds to prevent a windfall to the mortgagees.

On appeal, the Third Circuit noted that the automatic stay would not affect the secured status of a tax that had achieved lien status, but it prevented the creation of a lien post-petition. *Id.* at 84. Since the 1985 taxes had already obtained lien status on July 1, 1984 and the automatic stay took effect on April 16, 1985, the 1985 real property taxes were liens as of the date of the filing of the Chapter 11 and were unaffected by the stay.

As to the 1987 real property taxes the court looked to West Virginia law and determined that those taxes would have become liens on July 1, 1986, well after imposition of the automatic stay on April 16, 1985.

Thus, the 1987 real property tax claims would not have become liens on the property until after the effective date of the automatic stay and therefore are not liens. 11 U.S.C. Section 362. *See In re Carlisle Court, Inc.,* 36 B.R. 209, 214 (Bankr.D.D.C.1983).

Just as the Third Circuit determined that West Virginia law had created no lien for the 1987 real estate tax, applicable Michigan law has created no pre-petition lien for the 1988 real estate tax, perfected or otherwise. *United States v. Michigan, supra.* The post-petition creation of that tax lien accordingly violates Section 362(a)(4).

■ Despite, or perhaps more appropriately because of the paucity of analysis contained in the County and City's briefs,[4] and anticipating that the question may surface on appeal, I address an argument which neither the County nor the City has raised, that of whether the tax lien, without any "affirmative act" by either taxing authority was created and perfected by "operation of law," and therefore not violative of the automatic stay.

On this issue I heartily agree with the Second Circuit's analysis in *In re Parr Meadows Racing Association, Inc.,* 880 F.2d 1540, 1545 (2nd Cir.1989).

> Thus, the tax liens did not come passively into being "by operation of law"; rather, they were created and perfected as a direct result of the county's assessment and taxation process, which consists of several "affirmative acts" by county, town, and school district officers, administrators, and agents. (citations omitted)
>
> . . . . .
>
> Further, even if it were possible to create and perfect a lien without any action by the county, that lien, attaching to the property postpetition would still violate the automatic stay. (citations omitted)

The procedures Berrien County follows to create the real property tax lien at issue clearly demonstrates that lien creation can only be accomplished by the County taking

---

**4.** Despite the importance of the question raised, both the County and the City's briefs consisted of a mere three pages citing three cases without analysis.

numerous affirmative acts.[5]

The County states that since the Michigan statute cannot be distinguished from the laws of Maryland and New York, then this case must be decided in accord with *In re Maryland Glass Corporation*, 723 F.2d 1138 (4th Cir.1983) and *In re Parr Meadows Racing Association*, 880 F.2d 1540 (2nd Cir.1989).

In *Maryland National Bank*, Debtor Maryland Glass filed Chapter 11 on October 31, 1979, remaining in possession of its assets until the case was voluntarily converted to Chapter 7 on April 23, 1981. The real estate taxes for the 1980–81 year became due according to the following schedule: the date of finality as to the 1980 taxes was January 1, 1980, they became due and payable on July 1, 1980; and not having been paid, they became overdue and in arrears on October 1, 1980. The Debtor's real estate which was subject to Maryland National Bank's mortgage, was sold on July 23, 1981 and the proceeds escrowed. The City of Baltimore on its own behalf and as collector of taxes for the State of Maryland thereupon transferred its interest in the real property to the escrowed funds. The district court reversed the bankruptcy judge and affirmed the Bank's position that as the 1980–81 tax lien was neither perfected nor enforceable on October 31, 1979, the date of bankruptcy, the real estate taxes were not payable out of the sale proceeds.

On appeal the Bank argued that since the post-petition lien was not perfected or enforceable on the filing date, the lien could be avoided pursuant to 11 U.S.C. Section 545(2) which provides:

> The trustee may avoid the fixing of a statutory lien on property of the debtor to the extent that such lien—
>
> > (2) is not perfected or enforceable at the time of the commencement of the case against a bona fide purchaser that purchases such property at the time of the commencement of the case, whether or not such a purchaser exists.

The Bank also contended that as mortgagee it need contribute none of the foreclosure sale proceeds to satisfaction of the post-petition 1980–81 real estate taxes.

The Fourth Circuit disagreed pointing out that the trustee's Section 545 avoidance powers are subject to Section 546(b).

> [T]he rights and powers of the trustee under Section … 545 [avoidance powers] … are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection.

Explaining that Section 546(b)'s "interest in property" is not limited to liens, whether defined by federal or state law, the State and City's interest in the real estate before bankruptcy was analyzed.

After scrutinizing the applicable Maryland statute, the court concluded that the State had an "ever-present" interest in the property which could not be avoided by the trustee. This was because the Maryland legislature required that real property sale proceeds must be applied in satisfaction of any taxes due and payable by a corporate owner at the time distribution is made. This was held to apply even if at the time of sale the taxes had not yet become due and payable, but became due and payable before the party conducting the sale was able to distribute the proceeds. The court also concluded that a purchaser of real property cannot avoid the consequences of a property tax lien on the purchased realty where the lien represents taxes accrued before the date of sale. Allowing that Section 546(b) permits the perfection of an interest after bankruptcy, the Fourth Circuit reversed the district court's holding that the bankruptcy trustee could avoid the imposition of the city's 1980–81 real property tax lien.

> Congress in enacting Section 546(b) perceived that the mere intervention of a petition in bankruptcy should not be permitted to defeat *what would otherwise*

---

**5.** See the 1990 Property Tax Calendar published by the House of Representatives, Lansing, MI, and attached here as Exhibit A.

*be a valid security interest in property.* If that interest awaits perfection, and if the generally applicable state law permits that perfection to be good against an intervening purchaser, then the trustee should stand in no better shoes than such an intervening purchaser. *Id.* at 1143. (Emphasis added)

I find that *Maryland National Bank* is not dispositive of the issue presently before the court for the following reasons.

First, *Maryland National Bank* does not address the automatic stay issue that is primary to the present case.

Second, the County cited no section of the Michigan statute comparable to the Maryland statute. M.C.L.A. 211.40 does not permit a purchaser who buys real property after the December 1 lien date to avoid the consequences of that lien. In the case at hand, however, the taxes had not yet achieved lien status as of the date of bankruptcy. As *United States v. Michigan* instructs, unpaid real property taxes which accrue between December 31 of the preceding year and December 1 of the current year are not accorded lien status.

Finally, when referencing the legislative history as set out above, *Maryland National Bank* specifically mentions a "valid security interest." 11 U.S.C. 101(45) of the Bankruptcy Code defines security interest as a "lien created by an agreement." Whatever the County's interest here it is most assuredly not one created by agreement. In applying Section 546(b) the Fourth Circuit Court appears to have disregarded that portion of the legislative history expressing Congress' understanding of how 546(b) should be interpreted. As cogently explained in HR Rep No. 95–595, 95th Cong. 1st Sess. 371 (1977); S Rep No. 95–989, 95th Cong.2d Sess. 86 (1978):

> The rights granted to a creditor under this subsection prevail over the trustee *only if* the transferee has perfected the transfer in accordance with applicable law, *and that perfection relates back to a date that is before the commencement of the case.*
>
> The phrase 'generally applicable law' relates to those provisions of applicable law that apply both in bankruptcy cases and outside of bankruptcy cases. For example, many State laws, under the Uniform Commercial Code, permit perfection of a purchase-money security interest to relate back to defeat an earlier perfected non-purchase-money security interest if the former was perfected within ten days. UCC § 9–301(2). Such perfection would then be able to defeat a hypothetical judicial lien creditor on the date of the filing of the petition. The purpose of the subsection is to protect, in spite of the surprise intervention of bankruptcy petition, those whom State law protects by allowing them to perfect their liens or interest as of an effective date that is earlier than the date of perfection, It is not designed [to] give the States an opportunity to enact disguised priorities in the form of liens that apply only in bankruptcy cases. (emphasis added)

It is the emphasized words "only if" and "relation back" which the court believes are crucial to correctly applying Section 546(b) as the exception to the automatic stay explicitly recognized in Section 362(b)(3) which states:

> (b) The filing of a petition under section 301, 301, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 USC 78eee(a)(3)), does not operate as a stay—
>
> .   .   .   .   .
>
> (3) under subsection (a) of this section, of any act to perfect an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b) of this title, or to the extent that such act is accomplished within the period provided under section 547(e)(2)(A) of this title;

The interplay of Sections 362(b) and 546(b) form the cornerstone of the Second Circuit's *Parr Meadows* decision, which is the second case the County urges this court to follow.

Ronald J. Parr, chairman of the board of Parr Meadows Racing Association, filed for bankruptcy on June 12, 1979. On October 4, 1979 Parr Meadows Racing Association filed a Chapter 11 petition which was subsequently converted to Chapter 7. The Debtor's principal asset was the Parr Meadows Race Track located in Eastern Suffolk County and valued at several million dollars. Real estate taxes were not paid on the race track property for six of the seven tax years between 1978–79 and 1984–85. With bankruptcy court approval the race track was eventually sold for cash plus a note secured by a mortgage on the property. The note and mortgage were then discounted and sold by the trustee for cash with all earlier mortgages and liens previously encumbering the race track transferred to the sale proceeds. As might be anticipated, a dispute then arose as to the distribution of the sale proceeds.

Relying on annual tax liens which absent bankruptcy attached to the race track every December 1, Suffolk County claimed a priority as to the tax years 1978–79 through 1984–85. Maintaining that all these back taxes should be paid first, the County submitted its bills. Except for payment of the 1978–79 real estate tax lien which was created and perfected before the July 12, 1979 date of bankruptcy, the secured creditors opposed payment of taxes to the County.

The secured creditors contended that the automatic stay prohibited the creation or perfection of any tax lien after the bankruptcy petitions were filed. Both the bankruptcy judge, and the district judge on appeal, held that the taxes secured by liens created and perfected after bankruptcy was filed were unsecured and payable only after satisfaction of the claims of secured creditors. Specifically, both lower courts held that the automatic stay prevented the taxes from obtaining lien status. Soundly rejected was the argument that Section 362(b)(3) and Suffolk County's expansive interpretation of Section 546(b) provide an exception through which lien status could be achieved.

The Second Circuit reversed, persuaded by the argument that the County came within Section 362(b)(3)'s exception to the automatic stay.

Thus, simply stated, if a creditor possesses a prepetition interest in property, and State law establishes a time period for perfection of a lien based upon that interest, the "lien does not lose its preferred standing by reason of the fact that it [is] not perfected until after the commencement of bankruptcy" so long as it is perfected within the time period established by state law.

880 F.2d at 1546

Since there was no dispute that New York law allowed for perfection of the tax lien on December 1 of the tax year, or that the County perfected its tax liens on each December 1, the only remaining issue was whether the County had an "interest in [the] property" before December 1, and if so, when that interest arose. *Id.* Rejecting both the secured creditors' position that the County had no interest in the property until the lien date of December 1 when each year's taxes became due and payable, as well as the County's argument that in accord with the Fourth Circuit's *Maryland National Bank* its interest in real property is "long-standing" and "ever-present," the court undertook an in-depth discussion of the applicable New York tax statute and the taxation of real property in Suffolk County. The court concluded that the County had the requisite Section 546(b) "interest in property" on the tax status date, some six months before December 1 when taxes become due and payable and achieve lien status.

Of course, after the tax status date other acts are required before the amount of the tax is determined and the lien securing that tax attaches to any particular piece of property. But these acts are merely further steps towards the completion of the taxation process and the perfection of the county's interest in the property—an interest which arose on the tax status date when the county determined that the property was taxable, and

when it fixed the value of the property for that tax year.

880 F.2d at 1547.

Acknowledging that statutory exceptions to the automatic stay are to be narrowly interpreted and in accordance with the stay's underlying rationale, the court nevertheless found that the county's post-petition lien which arose several months after the filing did fall within 362(b)(3) and was saved by 546(b) as a "one-time exception."

Both the New York statute under consideration in *Parr Meadows* and the Michigan statute here provide that taxes become due and payable as well as rise to lien status on December 1. While acknowledging this obvious similarity between the two statutes, I am not persuaded by the reasoning employed in *Parr Meadows* to establish the County's interest in the subject real property.

On its face, 546(b) is ambiguous as to the type of "interest" Congress intended to protect. Does interest refer to something akin to a security interest, lien or mortgage or to an entity's mere expectation of payment? As previously noted, the applicable legislative history is contrary to the manner in which both the *Parr Meadows* and *Maryland Glass* cases have applied Section 546(b) to save the post-petition creation of tax liens.

Both the Michigan statute and the interpretive case law recognize that the real property tax lien arises and is perfected on the same day, which in the instant case was after the filing of involuntary petition. And further that the lien does not relate back to an earlier date. Thus, an element essential to application of 546(b) does not exist.

In *Matter of Grand Rapids Packaging*, 54 B.R. 282 (Bkrtcy.W.D.Mich.1985), Judge Howard recognized the necessity of the existence of the "relation back" element when seeking to apply the expanded protection of 546(b). The issue there was whether a tax lien attached to personal property now owned by the estate. Acknowledging that the question of whether the automatic stay precluded the creation of the lien was not before the court, Judge Howard noted

> Further, perfection of the Michigan personal property tax lien does not relate back to any date either pre- or post-petition. The lien is both created and perfected as of and from December 1st of each year. (citation omitted) 54 B.R. at 287.

I believe that this analysis can also be applied to Michigan real property tax liens when considering the 362(b)(3) exception to the automatic stay.

While it is clear that regardless of when it arises, the unpaid real property tax lien must be paid ahead of all other earlier recorded liens, this priority of payment requirement is simply that. The creation and perfection of the lien do not relate back to an earlier date. If an entity purchases real property on March 1, 1990 and sells it on April 1, 1990 and the 1990 taxes were unpaid as of the sale date, when December 1, 1990 rolls around and the 1990 taxes became due and payable as well as a lien under Michigan law, that tax lien would not relate back to April 1, 1990. Rather, under the statute's priority of payment the 1990 taxes would become due and payable ahead of all earlier created and perfected mortgages and encumbrances. This concept was ably explained by Judge Whelan in his *Carlisle Court* opinion.

> The assessed taxes, therefore, arise as liens related to a specific parcel of real property. Based on their *in rem* status, they remain as liens until satisfied by payment in full. Accordingly, the lien will be granted priority over private and prior competing security interests.

> This legal effect is consistent with the nature of the tax, *in rem* as to a specific parcel of property, and also is mandated by the type of claim involved; namely, the involuntary nature of taxes. Taxes imposed against real estate are not personal claims against the owner. Instead they constitute a charge against the property and stand on a higher legal footing than a consensual lien. As was described by the United States Supreme Court in *Osterburg v. the Union Trust*

*Company of New York,* 93 U.S. 424, 23 L.Ed. 964 (1887):

> "A lien for taxes does not, however, stand upon the footing of an ordinary encumbrance, and is not displaced by a sale under a pre-existing judgment or decree, unless otherwise directed by statute. It attaches to the *res* without regard to individual ownership, and when it is enforced by sale, pursuant to the statute prescribing the mode of assessing and collecting them, the purchaser takes a valid and unimpeachable title." *Id.* at 428

Furthermore, with respect to the burden imposed on prior security interests, such as the one held by the plaintiff in this proceeding, the prior secured parties are almost always in a position to control, in some manner, the payment of such taxes. This is best illustrated by the requirements imposed by lenders requiring the debtor borrower to escrow the amount of such taxes for a given tax period.

36 B.R. at 213.

Despite reversal by the Second Circuit, I am persuaded that the issue of the applicability of the 546(b) exception to the taxing authorities' post-petition perfection of its lien was correctly decided by the district court, *In re Parr Meadows Racing Association, Inc.,* 92 B.R. 30 (E.D.N.Y.1988). There Judge Wexler recognized that in order to apply 546(b), he must accept two underlying assumptions: that Suffolk County's interest in collecting post-petition real property taxes antedated the filing of the bankruptcy, and that the Suffolk County Tax Act is a "generally applicable law" that permits perfection of an interest in property to be effective retroactively. As to the first, Judge Wexler found that the County's interest in collecting those taxes is merely hypothetical and anticipatory in nature.

> Any present legal interest the county may have in real property taxes can only be created at such time as those taxes accrue and become due and payable. 92 B.R. at 33.

Nor could Judge Wexler find that the Suffolk County Tax Act met the second requirement.[6]

> Noticeably absent from this provision is any language providing that such tax lien will be deemed perfected as of a date earlier than the date the taxes become due and payable. The most reasonable interpretation of the Suffolk County Tax Act is that it creates a tax lien as of the date the property taxes are due, and that that lien is also automatically perfected as of the date the taxes become due. Syl[l]ogistically, then it follows that since this perfected interest post-dates the filing of the bankruptcy petition, it is avoidable by the trustee.

.    .    .    .    .

The legislative history of Section 546 cites to Section 9–301(2) of the Uniform Commercial Code as an illustration of what Congress viewed as a generally applicable law that permits retroactive perfection. U.S.C. Section 9–301(2) which many states have adopted, affords one with a purchase-money security interest ten days in which to perfect that interest. This ten day grace period allows the interest holder to maintain his status as an earlier creditor over one that obtains and perfects an interest during the intermediate days between the time the purchase-money security interest arose and the date of its perfection. So too does the interest holder maintain his status as a prior secured creditor during the ten day grace period in the context of an intervening bankruptcy. 92 B.R. at 34.

Declining to hold that the Suffolk County Tax Act provides an indefinite grace period during which Suffolk County can perfect its tax lien, Judge Wexler explained "that such an interpretation cannot be inferred from the language of the Act itself and is wholly inconsistent with the limited nature of Section 546(b)'s exception to the trustee's avoidance power." *Id.* at 34. I agree.

---

**6.** As in Michigan, the New York statute provided that liability arose on December 1 of each year—the same day the taxes became a perfected tax lien. 92 B.R. at 33.

## CONCLUSION

In light of *United States v. Michigan,* the unambiguous language of Section 362(a)(4), as well as the legislative history of Section 546(b), I find persuasive the Third Circuit's reasoning in *Equibank* and hold that the automatic stay prevented both the creation and perfection of the County's lien for 1988 taxes. To decide otherwise would ignore the plain language of 362(a)(4) and foster an expansive interpretation of the 546(b) exception to the automatic stay where Congress has clearly indicated that 546(b) requires a narrow interpretation.

In so deciding the court is not unmindful of the services and benefits which the City and County have provided this property. This decision, however, does not necessarily reduce the County to the status of unsecured creditor for the 1988 taxes incurred prior to the bankruptcy filing. As the parties neither raised the question nor briefed the issue, I do not here address whether the County's claim for 1988 taxes is entitled to priority status under Sections 503(b)(1) or 507(a)(7).

The Plaintiff shall present an order for entry consistent with this opinion.

## EXHIBIT A

### 1990 PROPERTY TAX CALENDAR

Below is a listing of days for 1990 on which taxpayers must do certain things to pursue an appeal of their property tax assessments and the dates on which the key decisions on setting tax rates and assessments are made.

| | |
|---|---|
| Dec. 31, 1989 | Tax day for 1990 assessments and property taxes. Deadline for counties to file revised starting base studies with the State Tax Commission. |
| Feb. 14, 1990 | Last day of deferral period for summer tax levies for qualifying taxpayers. Also, last day for payment of 1989 property tax without penalty. |
| Feb. 20, 1990 | Third Monday in February: Deadline for county equalization director to publish in a newspaper the tentative equalization ratios and estimated state equalized valuation multipliers. (Third Monday is a holiday; deadline delayed until next day.) |
| Feb. 20, 1990 | Deadline for taxpayer filing personal property statement with assessor. |
| March 5, 1990 | First Monday in March: The assessment roll shall be completed and certified by the assessor. |
| March 6, 1990 | Tuesday following first Monday in March: First meeting of township board of review. City board of review may vary according to charter provisions. |
| March 12, 1990 | Second Monday in March: Second meeting of township board of review. |
| April 2, 1990 | First Monday in April: Last day for completing assessment review. |
| April 10, 1990 | Tuesday following second Monday in April: County board of commissioners meets in equalization session. * Assessing officers tabulate additions and losses for each separately equalized class of real property for each unit of local government. |
| April 16, 1990 | Third Monday in April: Allocation board meets and receives budgets due this day. |
| May 1, 1990 | Last day for deferral period for winter property tax levies. |
| May 7, 1990 | First Monday in May: Deadline for assessing officers to file the tabulation of the assessed valuation for each classification of property separately equalized and provide to the county equalization director. Also deadline for filing county equalization report with the State Tax Commission. |
| May 14, 1990 | Second Monday in May: Preliminary state equalization valuation recommendations presented to the State Tax Commission. |
| May 21, 1990 | Third Monday in May: County allocation boards must issue preliminary order. |
| May 29, 1990 | Fourth Monday in May: State equalization hearing—issuance of final state equalization order by the State Tax Commission. (Fourth Monday is a holiday; deadline is delayed until next day.) |
| June 4, 1990 | First Monday in June: Deadline for notifying protesting taxpayers in writing of board of review action. * County equalization director calculates current year millage reduction fractions, including those for intercounty taxing jurisdictions, and delivers them to the county treasurer. |
| June 11, 1990 | Last day for hearing of allocation board (not less than eight nor more than 12 days after issuance of preliminary order). |

**284**

| | |
|---|---|
| June 11, 1990 | Allocation board must issue final order not later than second Monday in June. * County treasurer certifies state equalized valuation for prior year and current year, the amount of new construction and improvements, and the current year's millage reduction fraction for each unit of local government. |
| July 2, 1990 | Deadline for assessment petition to the Michigan Tax Tribunal. |
| July 2, 1990 | Taxes due and payable in those jurisdictions authorized to levy a summer tax. Charter units may have a charter provision with a different due date. |
| July 17, 1990 | Tuesday following third Monday in July: Special board of review meeting may be convened to correct a mutual mistake of fact or clerical error. |
| Sept. 14, 1990 | Last day for qualified property taxpayer to apply for deferral of summer tax payment. |
| Sept. 30, 1990 | Clerk of township or city delivers to supervisor and to county clerk a certified copy of all statements, certificates, and records of votes directing monies to be raised by taxation of property. * Financial officer of each unit of local government computes tax rates in accordance with sections 34 and 34d of the General Property Tax Act, and the local governing body certifies that rates comply with Article IX, Section 31 of the Michigan Constitution. |
| Oct. Session | Apportionment meeting of county board of commissioners. The board examines certificates for levying taxes and directs the spread of taxes in terms of millage rates to be spread on state equalized valuations. * County board of commissioners shall not authorize the levy of a tax unless the governing body of the taxing jurisdiction has certified that the requested millage has been reduced, if necessary, in compliance with Article IX, Section 31 of the Michigan Constitution and sections 34 and 34d of the General Property Tax Act. The board also receives certifications that truth in taxation hearings have been held, if required. |
| Dec. 3, 1990 | Property taxes due. Tax levy reports from assessors to State Tax Commission due. County apportionment report to the State Tax Commission due. |
| Dec. 11, 1990 | Tuesday following the second Monday in December: Special board of review meeting may be convened to correct a mutual mistake or clerical error. |
| Dec. 31, 1990 | Tax day for 1991 taxes. County equalization studies for 1990 revised bases filed with the State Tax Commission. |

---

* Requirements caused by Article IX, Section 31 of the Michigan Constitution and by Act No. 35 of the Public Acts of 1979.